So, you have double duty today. Yes, I do. May it please the court, my name is Rebecca Smith again, and this time I am representing Swan View Coalition et al., and I would like to reserve three minutes for rebuttal. On this case, Your Honors, I'd like to start by addressing the sort of basic question here on the Wolverine consultation, as in what level of consultation is required for a not yet listed under the Endangered Species Act. Again, when we look, if we start with the statute, the statute as well as the regulation, both of them say that proposed species must be included in the biological assessment. Where does it say that in statute? I'm looking at 16 U.S.C. 1536 C1, okay, and it says, quote, each federal agency shall request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data, that such species may be present, the agency shall conduct a biological assessment for the purposes of identifying any endangered species or threatened species which is likely to be affected. That's a weird statement because the first talks about proposed, but what they're actually going to do a biological assessment of is endangered species or threatened species. It doesn't say anything about doing a biological assessment of proposed. Well, that last phrase, any endangered species or threatened species, it doesn't actually say listed or proposed, and I think that the gist of the statute is that... I thought endangered and threatened is defined in the statute. Listed is endangered and threatened and doesn't include proposed. Well, I'm saying in this statutory provision, because they're using that phrase proposed or listed, proposed or listed, but then they use a different phrase. When a species is determined, is proposed for listed, that means the agency has already undertaken the scientific analysis that has shown that it needs to be listed. It just needs to go through an additional public comment process before it gets actually listed, and so in terms of its need for being listed, whether it actually is scientifically endangered or threatened, once a species is proposed, there has already been a determination that it is warranted, that it is scientifically endangered or threatened, and so the reason this is even a bigger issue in this case is because the wolverine has basically had a pending listing determination for 20 years at this point, and we know that back in 2016, the District of Montana said that the most what the District of Montana did was vacate the ruling that said it wouldn't be listed, and then the result of that vacature is that the proposed rule went back in effect, but the statute says a proposed rule can only be in effect for 18 months before the final rule has to be issued, and so now here we are three years later, we still don't have a final rule, even though by statute we should. Let me just see if I can recount how you're reading the statute. You're saying that by saying that they're supposed to figure out whether a proposed to be listed statute may be present, then they're supposed to conduct a biological assessment to identify an endangered or threatened species, whether it's listed or not, is that what you're saying? That they can look at whether something is listed or not? That's not silly, but I understand, I mean, it gives at least some point to the confusion here, but . . . Yes, because scientifically, a species that is proposed for listing as an endangered or threatened species has been found to warrant that. How come they're not listed? I don't understand that. Because of agency delay. The facts do warrant . . . That's still some question out there about whether they're actually endangered or threatened? Isn't that why it hasn't happened yet? Well, no, Your Honor. The District of Montana found that there was no scientific basis to refuse listing . . . I'm talking conceptually. Oh, in here. Conceptually. Well, because there is an 18-month delay between a proposed listing and a final, and that is just because there's a public comment period between the proposed listing and the final listing. You think something can be an endangered species or a threatened species for purposes of the statute, even though it hasn't been listed as endangered or threatened for purposes of protection under the ESA? And the reason I think that, Your Honor, is because the statute twice right before the sentence says proposed or listed, proposed or listed. And so it wouldn't make sense for the statute to say, find out whether any species proposed or listed may be present. If such species proposed or listed may be present, prepare a biological assessment. Why would they then exclude those proposed species when the proposed species might have been the sole trigger for the preparation of a biological assessment? Well, yes, but if they were trying to say what you're saying, they presumably would have said that they should conduct a biological assessment for the purposes of identifying any proposed or listed species which is likely to be affected by such action. But that's not what it says. It is very confusing. It is confusing, Your Honor. And then in the regulations, they're not so confusing. The regulations themselves say, quote, biological assessment shall evaluate the potential effects of the action on listed and proposed species. That's 50 CFR 40212A. So even if there was ambiguity in the statute, when they implemented And the next sentence says that the procedures of this section are required for federal actions that are major construction activities. Yeah. Isn't that the problem? I mean, the reason your statutory argument would carry force is that it would override that limitation in the reg. And the district, well, the government here is certainly taking the position that this is not a major construction activity. So therefore, the reg doesn't even apply. And our response, of course, is statutory there, that the statute says biological assessment for any agency action. And that's not limited to a construction activity analyzed in an EIS. And consultation has never been. But that's circular because you're trying to use the reg to interpret a ambiguous statute. But the reg wouldn't apply here. So it doesn't help you very much. So we're back to the statute. If the court finds that that entire section, which I believe is 40212, only applies to construction activities . . . Isn't that what it says? Major. What else does . . . What I'm saying, Your Honor, is that's the only part in the regulations that define what a biological assessment is. And so then the question is, are biological assessments that are written for construction activities something separate than biological assessments that are written for every other purpose? And if so, where's the regulatory provision that addresses all the other biological assessments? I guess there isn't one. And that is sort of a confusing interpretation of the regulation. Are you challenging the validity of this regulation, 402.12? Only to the extent it would say that a biological assessment is only required for a construction activity . . . Well, that's pretty big. . . . analyzed in EIS. That's a massive challenge in the sense that certainly the statute . . . And Your Honor, there is another way to look at this, which is that in other cases . . . so the statute basically says, except for activities . . . basically there's sort of an exception about construction activities in the statutes. If the activity had already started, that they don't need consultation. And that seems to be where this language in the regulation was drawn from. The major construction activities was drawn from that part of the statute. And so . . . What? I'm sorry. The statute gives an exemption and says you don't need to do consultation if a construction activity had already started when the ESA was originally passed. So that might have been where that language came from. And in other cases, you know, this Court has looked at similar sort of situations and said, well, maybe, you know, something like this regulation on major construction activities, it's not saying this is the only activity that requires a biological assessment, but that this is one of the activities. And the reason . . . Yeah. I suppose you could read it to say that the procedures of section are required for major construction activities if they were not entered into or bug-eyed before . . . but it doesn't say anything. It doesn't say it's never required otherwise. That's what you're saying. And also, the difference there would be that a major construction activity analyzed in an EIS always needs a biological assessment, even if we don't know if there's listed or proposed species that may be present, whereas what the statute talks about is any agency action where listed or proposed species may be present. And so maybe that's the distinction, is that what the regulation is in addition to areas where there's an agency action where listed or proposed species may be present, there is also this separate category that requires a biological assessment, construction activities analyzed in an EIS, major construction activities. Then when you get to uses of the biological assessment in the reg, it does seem like they're only talking about listed species. If a biological assessment indicates that there are no listed species or critical habitat present that are likely to be adversely affected, then formal consultation is not required. So now we seem to be back to listed species. Because that's the formal consultation regulation. But in the biological assessment regulation, which is 402.12, it says a biological assessment must address the effects of the action on proposed species, determine whether any proposed species are likely to be adversely affected by the action, and determine whether conference is necessary. But if this, I'm sorry. You're reading from subsection K of that same reg. Right. That's right. Your thing, can you look at subsection K? Because that's where Judge Bernstein was just reading from. 402.12K. K. Yeah. The reg you just said. Right. I mean, if it's not listed, then obviously no listed species are adversely affected and it's a rather short biological assessment. It doesn't make a lot of sense to be including proposed species when the only question you're trying to answer is whether listed species or critical habitat are adversely affected. What are you going to say? You're going to say one sentence. No, they're not because they're not listed. And, Your Honor, I guess what this comes back to again is that in this specific case, the wolverine should not be only a proposed species. That's not this case. That's the problem. Yeah. Right? It's not this case. It's your other case or somebody's other case. But that's the effect, that is an impact that this case feels is that if that law had been followed, the wolverine would be listed and we wouldn't have to be here today. That's fine, but it's not this case. Well, Your Honor, I would ask the court to apply the policy of institutionalized caution from the Endangered Species Act, which basically says if we have a that's this policy of institutionalized caution that recognizes that the protection of endangered species takes priority over the primary missions of the agencies. And so in this case, this species should be listed. It should be included in this consultation. And we're sort of just looking at this somewhat confusing statute to determine whether the statute requires it because there's also a confusing regulation. But if we come back to what the substance is, it's that this species warrants protection and is going to be affected by this project but is not yet been analyzed in a consultation. And you know, there are a number of cases saying that the benefit of the doubt, if there's a question goes to the species, a tie in the evidence should go to the species. And we would just request that that same consideration be applied in this case to this interpretation of regulation that the congressional intent behind the Endangered Species Act certainly wouldn't have wanted a species like this to flounder without consultation after 20 years of being warranted for listing. Moving on to the grizzly bear issue, well, Your Honor, I do say I only have two minutes left. All right. Go ahead. We'll give you a minute at the end. I don't know about all. But here's my question about the grizzly bears. It seemed to me that the Forest Service did exactly what you said they should have done. I'm sorry, Your Honor? That the Forest Service did what you said they should have done. Well, Your Honor, the issue is that they said that the project itself was not likely to adversely affect the grizzly bears. I thought they said it was likely to adversely affect grizzly bears. They did engage in formal consultation. And then the Fish and Wildlife Service issued a no jeopardy opinion. What happened was they found that the baseline was adversely affecting the grizzly bears because none of the road density standards are complied with. But then they said in terms of the project itself, it's not likely to adversely affect. And so our argument – I thought they did engage in formal consultation. Well, it's debatable whether it was – what it looks like is a letter of concurrence, which doesn't look like a biological opinion. And so – Longer than the other biological opinion, isn't it? That is true, Your Honor. And so here what we're really looking at is – But their conclusion was that due to this condition, the determination for grizzly bear is may affect, likely to adversely affect. That was their conclusion. And then they went on to say, but for the project itself, it's not likely to adversely affect. And – The determination of grizzly bear due to the effects of the Glacier Loon Fuse Reduction and Forest Health Project is may affect, not likely to adversely affect. Right? But then it – And then they say – But then it doesn't comply with Article – with Amendment 19. So the determination for grizzly bear is may affect, likely to adversely affect. And then they referred it. They did refer it. And so – What would have been different if they made a – if they made a specific different finding with regard to the project, with regard to whether there was a consultation? Thank you, Your Honor. That is really sort of the meat of the question here, is what would have been different. And so what would have been different if they had said the project itself was likely to adversely affect? That would have been a recognition that increasing roads above an already harmful level caused an additional adverse effect. And the result of that would have been an incidental take statement for this project that said, here are the terms and conditions of an incidental take statement. Here's how you're going to limit the increasing road density. But that's only if the biological opinion agreed with it, agreed that there was some endangerment. Right? But the biological opinion begins by saying that a determination on the grizzly bears is – may affect, likely to adversely affect, and then they go on to the grizzly bears at some length. And they say that there are no adverse effects other than the existing baseline road density. And so our argument is just that increasing road density from something like 22 to 38 percent during the project is going to have an adverse effect. And because that's already incidental take – But that doesn't, as what I understand to be, the challenge you made. I understood you were making a procedural challenge. No, Your Honor. Our last case was a procedural challenge. This is a substantive challenge to whether they can say there's no adverse effect when they increase road density above a level that's already causing incidental take. Whether who can say? Whether the agencies can say that. Whether it's arbitrary and capricious for the agencies to say increasing road density above a level that already causes incidental take does not cause additional incidental take. Because the difference is that they would have had to have an incidental take permit slash statement for this particular project. And the reason that we even think this is an issue is because in the directly adjacent log-in project, the Beaver Creek project, which was addressed in Friends of the Wild Swan – same area, same lake, same ranger district, same national forest, both sides of the same lake, same size project – and they made the exact opposite conclusion. They said increasing road density above these levels from the project increases incidental take statement, and they wrote a biological opinion. They provided an incidental take statement. And so all we're really asking in this case is for this case analysis to be consistent with that directly adjacent log-in project, which came to the exact opposite conclusion. Okay. You're out of time. Okay. Thank you. May it please the Court. John Smeltzer for the Forest Service and the Fish and Wildlife Service. Your Honors, I should start, I guess, with the Wolverine statutory and regulatory issue where Ms. Smith started. And I'd like to start again with the statute and the statutory provisions. The statute is pretty mysterious. There's some ambiguity, I think, in the C-1, Section 7C-1 provisions that the Court was looking at. But let me start with just the observation that the conference obligation is in Section 7A-4, which is a different part of the statute than the consultation requirement, which is 7A-2. And the conference obligation is the statutory duty in Section 7A-4 is narrower than the duty in 7A-2. And it specifically says that the Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species. So the conference obligation kicks in when it's likely to jeopardize. And the statute doesn't say that there is any conference duty on sort of the threshold question of whether that is likely. So then you go to the Section 7C-1 that the Court addressed earlier. And I would note that the opening clause of that section says, quote, to facilitate compliance with the requirements of Subsection A-2. That's the consultation part. It's not the conference part. So it even begins by saying this is about consultation. You know, it does. Do you think we should give any consideration to the fact that the agency is not in conformity with its obligations when it's allowed to propose a species that's proposed to be listed to be proposed for 20 years? The proposed listing here was in 2014, Your Honor, so 20 years is an exaggeration. But the short answer is no, because that's a separate case and that's a separate question, whether the listing ought to be approved. You're pointing three years, but it was supposed to be decided in 18 months, right? Right, and it could have been decided negatively. I mean, the Court can't presume the result of the listing proposal. That's what I don't understand, because the representation that was made before was essentially that there's already been a determination that it's an endangered or threatened species. Is that wrong? It's been proposed for listing as a threatened species, Your Honor. But the representation that was made, and I don't know this, was that the scientific determination has been made that it's threatened or endangered, essentially it's just sitting on somebody's desk waiting to get listed. Well, that's not quite, I mean, that's an oversimplification. Obviously, when the agency proposes a listing, they have reason to believe there's concern based on a particular risk, and that proposal was made. And that proposal is still out there. And the question for this Court is, did— But it's made to itself. That's the part I don't get. Who's making the proposal? The Fish and Wildlife Service puts out the proposal for public comment, and then in receiving public comment, it makes a determination as to whether they're going to make a final listing decision. Oh, I see. So this is proposed in the sense that a proposed regulation— It's a process, Your Honor. And that process is— So the conclusion hasn't been reached, you're saying, as to whether this is—let's go back to the statute, though. Right. It is really peculiar. Because, just a minute, C-1 says that you have to request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action, all right? If the—then it seems to—if the Secretary advises, based on the best scientific and commercial data available, that such species may be present, that is, either listed or proposed, right? Right. Then the agency is supposed to conduct a biological assessment for the purposes of identifying any endangered species or threatened species. Well, it does sound like the endangered species or threatened species here is something different than listed. Because in this— Right. Sentence. It's a little bit confusing as to what the purpose of the—of the assessment then is at that point. Because you—it's clear that the agency has to—or the agency has to ask for which species are present, and the Fish and Wildlife Service provides that information. And then the agency is to prepare a biological assessment. But what the statutory language is telling you is that the principal purpose of that assessment is to determine the effects on the listed endangered and threatened species. And— Well, it doesn't say listed, though. That's the point. No, I understand. And—but if I can go one step further, is to say the other thing the statute doesn't say in this provision, Section 7c1, is—is that this biological assessment has to be prepared for the Fish and Wildlife Service, and they have to receive concurrence from the Fish and Wildlife Service in order to satisfy the statutory obligation. It's simply saying that the agency has to do an assessment. So what we are saying in our briefing—in our briefing, we gave the benefit of the doubt to the plaintiffs that an assessment has to be done, but we are saying the assessment is for the purpose of the conference, ultimately, because a proposed species, what's important is the— It's for the purpose of what? The A4, Section A4, to the extent there's an obligation with respect to proposed species, it's the obligation to confer if you're likely to jeopardize, right? So the obligation is to assess in order to make a—is this likely to jeopardize, and therefore, we need to confer determination, which is different than is it likely to affect, and therefore, we need a biological opinion that may deal with harmful effects that arise to the level incidental take, but don't arise to the level of jeopardy. We now conduct a biological assessment for the purpose of identifying any endangered species which is likely to be affected. So it is about being effective. Right. What I'm saying is that last clause, Your Honor, read, talks about essentially the obligation to determine what's needed for consulting with respect to— All right. So why are they—therefore, if the Secretary advises, based on the best scientific and commercial data available, that such species may be present, including proposed species, then what? What are they supposed to do next for a proposed species? Right. And that's where the statute becomes unclear, right? And so that's when you look to the regulation to see, does the regulation impose an obligation in addition to what the statute opposes? And again, remember, as I just said— No. I mean, so you're not looking to it for interpretation purposes. You're looking at some other— I'm saying the regulations, the Fish and Wildlife Service and the National Marine Fishery Service have authority to issue regulations to administer and implement the statute, and they can impose certain requirements— Okay. So what regulation do you want us to look at? 402.12? Right. What I'm saying is that the duty to effectively get a concurrence from the Fish and Wildlife Service with respect to the A4—and again, we're talking about just getting a concurrence letter. We're not talking about whether they have to do the assessment, because we did the assessment in this case. The question is, did we get the Fish and Wildlife Service concurrence letter on the site-specific assessment, which we did in 2012? And so you look to the reg to see, you know, when does the reg say— What reg are we looking at? Starting first with section 402.10, 50 CFR 402.10, that's the reg that governs the conference on proposed species or critical habitat. There's nothing in that reg that requires any consultation and concurrence with respect to the conference obligation. So then you move to—and that's the one that deals specifically with A4 and the conference duty. Then you move— You're saying which is likely to jeopardize if the federal agency decides that it's likely to jeopardize. Well, it's also in there, if the Fish and Wildlife Service determines it's likely to jeopardize, Fish and Wildlife Service can reach out itself, but that's the standard. And there's nothing in there that requires consultation and concurrence. There's nothing in there that requires a concurrence letter. And so then you go to section 402.12, and that's the one section that does apply. And it says for any major federal construction project, right? That's— Well, it doesn't really say that. There's a generic statement first, a biological assessment shall evaluate the potential effects of the action on listed and proposed species and determine whether any such species are likely to be adversely affected. Then the major construction activities doesn't say the procedures of the section are required only for federal actions that are major construction activities. It seems to be saying that it's required for—it seems to be a limitation on when it applies for major construction activities, providing that a contract for construction was not entered into or actual construction was not begun on or before November 1978. So it doesn't really seem to be a limitation that says it's only done for major construction activities. Well, Your Honor, I think that the clear way to read it, it is limited to major construction activities. Is there anything in the statute that will allow that limitation? Let's assume we were talking about listed species. Is there anything in the statute that would allow the limitation to major construction activities? This section isn't limited, 402.12 isn't limited in its entirety to listed species. You have to look to the— I know it's not limited to them, but on your theory, it would cover them, and therefore, it would only require a biological assessment for listed species if there's a major construction activity, no? No, the statute would still require an assessment. And if you look at section 402.14a, section 402.14a says that an agency has to consult with—has to do formal consultation with Fish and Wildlife Service on any action that may affect a listed species. I'm really quite confused. Right. I'm— 402.12 is headed biological assessments. That's right. The first sentence of it talks about what a biological assessment is supposed to do, including listed species. Let's deal with hypotheticals now, okay? Right. Preparation requirement. The procedures of this section are—I mean, this subsection seems to deal with major construction activities, but it doesn't suggest that the biological assessment requirement is limited, right, to construction activities. If you look at the—and we also cite the consultation handbook. That is the way the regulation is read. And what I'd like to turn the Court's attention to is that regulation can't be read in a vacuum, because under section 402.14a, any action, regardless of whether it's a major construction activity, any action that may affect a listed species must lead to formal consultation unless, in informal consultation or through use of a biological assessment, there's a determination that it's not likely to adversely affect. And that's where that regulation in section 402.14 leads you back into section 402.13, which is informal consultation. And the first sentence of that section says, informal consultation is an optional process that includes all discussions, correspondence, et cetera, between the service and the Federal Agency. The limitation to major construction projects really isn't relevant here, is it? Yes. Yes? Yes. That's correct. It's not relevant here. It is relevant. Well, why? Because we were reading Kay before, and Kay says that if the biological assessment indicates that the action is not likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of the proposed critical habitat and the director concurs, then a conference is not required. That's right. And what I started with was the notion that section 212, this one section, is the one area where the regulation directly talks about when there is an obligation to do a consular or I don't even know what to call it, because it's not a consultation under the statute, but to do an assessment with a concurrence letter. Who's the director? Is that? That's Fish and Wildlife. Is this? So there does have to be a concurrence with regard to it not likely to jeopardize the continued existence? If you have a major construction activity and if you go to section D1, it also says if the director advises that no listed species or critical habitat may be present, the federal agency need not prepare a biological assessment and further consultation is not required. And if only proposed species or proposed critical habitat may be present, then the federal agency must confer with the service if required under section 402.10, but preparation of a biological assessment is not required unless the proposed listing or designation becomes final. What 402.12 says, if you have a major construction activity, which we don't have here, and you have other listed species involved, then you have to do a biological assessment under this section. That's what 402.12 says. What 402.13 says is the biological, the informal consultation is optional for purposes of proposed species and it only talks about it being required to get a concurrence letter with respect to consultation. And again, the key provision for listed species is 402.14, which essentially requires you to go through informal consultation or a biological assessment whenever you have a listed species. So this, what we're talking about is a narrow exception that solely is with respect to whether you need a concurrence letter for a proposed species. And the statute doesn't require it and the regulations don't require it. But your honors, even if it did, let me just say that we did fully in 2012, the agency did an analysis to determine the impacts of this project, the project-specific impacts on the wolverine. At the time, the wolverine was a sensitive species. But they did the analysis and they determined in that analysis that at elevations above 8,000 feet is the denning habitat, right, for the wolverine. Right. Who did this? The Forest Service. The Forest Service is part of its NEPA documentation and the statute says you can do your biological assessment as part of your NEPA documentation. So in the NEPA documentation, they did an analysis to determine, you know, where the habitat is for the wolverine. And it was determined that the primary habitat of the wolverine is areas where there's persistent deep snowpack, which means snowpack of five feet or more that lasts into the springtime. They mapped, you know, that habitat in the project area. They determined there is some of that habitat, some of that primary wolverine habitat in the project area, but mostly in the Mission Mountain Wilderness Area. And that none of the project activities here were going to occur in that primary habitat. And that none of the activities here were anywhere close to any of the denning habitat. And therefore, the Forest Service made the conclusion that they were not likely to lead to a trend to listing. Initially, that was a determination made in 2012, or impact the viability of the species. They didn't use the magic words of the ESA because the species wasn't yet listed. So in February 2013, right before the Forest Service was going to sign off on this project, the species was proposed, the wolverine was proposed for listing. So at that time, the wildlife biologist for the project went and put a document in the record that said, re-evaluated what had been done and then looked at some additional details and said, this is not likely to jeopardize the species. And therefore, the conference obligation won't kick in. But then, in addition to that, in May of 2014, the agency did a programmatic analysis with respect to timber activities in general. And the court needs to be aware that when the proposed listing came out, the determination was that it was global climate change that was imperiling the wolverine. Because the habitat areas of the wolverine are high elevation and snowpack. And when the agency proposed listing the wolverine, they specifically looked at other potential risks, including timber sales, and they said these routine timber projects are not an activity that's imperiling the wolverine. And therefore, the Forest Service did this programmatic analysis with which the Fish and Wildlife Service concurred. So we have a concurrence letter that's perfectly sufficient. That's what the district court determined. We just want the court to understand as well that the district court was wrong to presume that there was a requirement for a concurrence letter because it's not in the regulations and it's not in the statute. But if this court somehow believes it is, the record is perfectly clear that we got our concurrence letter. And the very, very last thing I want to say on that is in the reply brief, the plaintiff said in Thomas V. Peterson that you couldn't have a harmless hare type situation under the Endangered Species Act. But that was a case where there was a wholesale failure to do any analysis. That is not this case. It does not apply. If there's somehow a requirement here, it is clearly harmless hare. Thank you. Thank you very much. I'll give you a minute or so. Two minutes. Somebody decided you're getting two minutes. Not me. Go ahead. Your Honor, the project biological assessment for this project, there's three versions of it. ER 786 to 806, ER 634 to 653, and ER 401 to 426. The wolverine is not in the project biological assessment. I just wanted to clarify that point. There is no project biological assessment that analyzes the effects of this action on wolverine. I want to just really touch base quickly on that statutory versus regulatory issue one more time, just to make clear in the statute, at 16 U.S.C. 1536 C1, it says, each federal agency shall, with respect to any agency action of such agency, for which no contract for construction has been entered into and for which no construction has begun on November 10th, 1978. So that same language is the language that they then put in that regulation subsection. So all they were doing in the regulation was taking that statutory language and saying consultation does not apply to actions for which a contract for construction has already been entered into by November 10th, 1978. And the regulation just reiterates that same statutory language. To then sort of expand it and say that now you only need a biological assessment if it's a major construction contract, I think, would misconstrue the fact that they were just taking that regulatory language from the statute to be clear that no consultation was required if a contract for construction had already been entered into by November 10th, 1978. But what about this K-1 provision of the regulation? You're looking at 402.12, I'm sorry, what? 402.12 K-1. 402.12 K-1. Yes, so it says the federal agency shall use the biological assessment in determining whether formal consultation or a conference is required under 402.14 or 402.10. So the formal consultation is for listed species, conferences for proposed species. So they're saying you have to use the biological assessment to determine whether you need formal consultation for listed species or conference for proposed species. Is that the... But if the biological assessment indicates that the action is not likely to jeopardize the continued existence of proposed species, and the director concurs, then a conference is not required. Yes. And so a conference is sort of the, is analogous to a formal consultation. Formal consultation happens for listed species. So what's your complaint here, that the director didn't concur? Yes, Your Honor, that the, that the wolverine was not in any version of the project biological assessments or any version of the project letters of concurrence. You're saying the biological assessment didn't indicate that the action is not likely to jeopardize the continued existence. No. Yes, Your Honor, that's correct because it didn't address the wolverine at all. Those citations that I mentioned when I first stood up here, those are the project biological assessments and they do not include an analysis on the effects of wolverine. And then the project concurrence letters also do not address the wolverine. But we have... Well, what about all those studies? I'm sorry. Go ahead. What about all those studies that counsel just cited to us? What were they? He was referring to the NEPA analysis that the agent... Well, first he's referring to the NEPA analysis, which as this court has said before in Seattle Audubon Society, you can't just decide that either one statute or the other applies. So in this case, NEPA and the ESA apply. So in Thomas v. Peterson, this court said it's not a de minimis violation of the ESA to fail to prepare... But that's not the question. The question is whether a NEPA statement can be sufficient to be a biological assessment. Yes, Your Honor. And so that... Does that have to be called biological assessment to be a biological assessment? No, Your Honor, but they did call it a biological assessment in this project. They did prepare a standalone document that said, this is our ESA project biological assessment, and they just chose not to put the Wolverine in it. And so based on their argument, any sort of analysis they did in their NEPA documentation should just be a substitute for the biological assessment, which might make sense if they hadn't actually done a real biological assessment in this case, which they did, but they intentionally omitted the Wolverine. That was only because at that point the Wolverine had... The proposal had been rescinded or whatever, right? No, Your Honor. That was a 2013 biological assessment, and then there was several more iterations of it. And the proposed rule was issued in 2013. So at the time this case was originally filed in 2014, it was a proposed species. And at that time when the district court entered its summary judgment order, it said, yes, you do need to include it in the biological assessment. They didn't include it in the concurrence, but they just withdrew their proposed listing because they have an 18-month period to decide whether to withdraw. So they issued a proposed ruling in 2013. They withdrew it 18 months later, and then the conservation group sued on that withdrawal. And then in 2016, the withdrawal was vacated. Right. But I thought it was in that interim that these reports were prepared and the biological assessments were prepared, and that's why the Wolverine wasn't included. Not in the 2013 version. And then there was two more supplements to that version. So it was proposed. They knew it was proposed, but they don't believe that proposed species, as you can see, the government just has a fundamental position that it doesn't believe proposed species need to be included in a biological assessment. And that's why we are here arguing this case today is because that is their position, and they strongly argue it, and we strongly disagree with that position. And you're saying that the NEPA report is no substitute? Yes, Your Honor. And that is because there are two different purposes, and a NEPA analysis is never going to get a concurrence from the Fish and Wildlife Service. So the purpose of NEPA is to do a public analysis where the public comments, the action agency makes its decision. The purpose of an ESA consultation is for the action agency to say, here's what we're doing, and this is what we think the effects are, and then they give it to the agency that's supposed to be the expert agency on wildlife, and they say, give us your opinion, wildlife experts, on how this will affect endangered species in particular. And so if the analysis is just an NEPA analysis, it never gets that second step of the check by the expert wildlife agency, and that's why the ESA sets that specific two-step process where the action agency is not the same agency analyzing the wildlife effects. The action agency does the biological assessment, the wildlife agency does the concurrence or biological opinion. All right. You are very well on time. Thank you both for your arguments in a complicated case. Swan View Coalition v. Weber is submitted, and we are in recess. Thank you. All rise.
judges: Berzon, Watford, Rothstein